445 So.2d 1184 (1984)
STATE of Louisiana
v.
Frank JARMAN.
No. 82-KA-2194.
Supreme Court of Louisiana.
January 16, 1984.
Rehearing Denied February 15, 1984.
*1186 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie Brown, Dist. Atty., Kay Kirkpatrick, Ralph Roy, Asst. Dist. Attys., for plaintiff-appellee.
Bryan Bush, Bush & Marablella, Baton Rouge, for defendant-appellant.
DIXON, Chief Justice.
Frank Jarman was charged by bill of information with attempted second degree murder. (R.S. 14:27 and 14:30.1). After a two day trial, a jury deliberated for some three and one-half hours and found him guilty as charged by a vote of eleven to one. The trial judge sentenced him to thirty years in prison. On appeal, Jarman assigns and argues seven errors in the proceedings below. None of them has merit. His conviction and sentence are affirmed.
The charges against Jarman arose out of an incident which occurred on the night of November 6, 1977, in Baton Rouge. In September, 1977 Jarman and Linda Smith separated after living together for several years. Smith moved with their two children (ages two years and seven months, respectively) from New Orleans to her parents' home in Baton Rouge. The charged offense occurred when Jarman confronted Smith and the children as she was leaving a friend's house a block away from her parents' home.
According to the state's witnesses, Jarman had attempted by phone to effect a reconciliation with Smith. She refused. On November 5, Jarman showed up at Smith's parents' home, wanting to see the children. Smith allowed him to see the children on the porch, but she refused to let him take them across the street. Jarman then became angry and threatened to "blow her up." Jarman then left. Smith's father reported the threat to the police when he learned of it later that evening.
On the next day, around noon, a neighbor spotted Jarman carrying what appeared to be a rifle or shotgun wrapped in a brown paper bag. Later that same evening, Smith and the children visited a friend's house less than a block away from her parents' house. Around 10:00 p.m. she phoned her father to say she was on her way home and that her friend, Sharon, would take her. Everyone was concerned at the time about Jarman's threat.
Joseph Bell, Sharon's cousin, carried one of the children to the car, and Smith carried the other. Jarman appeared from behind a parked car and said, "I've been waiting." Jarman and Bell struggled, and Jarman drew a sawed-off single barreled shotgun. The child was knocked to the ground. Jarman hit Smith with the butt of the shotgun and took off after Bell.
Jarman returned, however, almost immediately, now brandishing a pistol in addition to the shotgun. He then struggled with Smith, and the shotgun discharged. Smith was hit in the right elbow. Her children, according to Smith, were also wounded.
Smith broke free and ran down an alley where Jarman cornered her again. He then began to pistol whip her. She claimed the blows fractured her skull. At this point, Smith's father came up. Jarman had the shotgun to her face and threatened to kill her. Jarman backed toward the street holding Smith at gunpoint. Mr. Smith then told Jarman that the children had been shot. Jarman cocked the pistol and pointed it at Mr. Smith. He then, however, shoved Linda toward her father, told her to see about the children, and ran off.
An arrest warrant for Jarman was issued on November 8. Jarman was not, however, arrested in Louisiana until some four years later. After the incident he went to California. His arrest there on unrelated charges revealed the outstanding Louisiana warrant and led to his extradition here.
Jarman testified on his own behalf. He told another version of the events. He said he went to Baton Rouge to see his children. The meeting with Linda was friendly, and she accepted some money he had brought for the children. She told him he would never see the children again. He denied making any threats. He also denied carrying *1187 a paper bag or shotgun at the time. (He was never asked, however, about the next day when the neighbor allegedly saw him).
Jarman also admitted being in the neighborhood on the evening of November 6. He claimed he wanted to talk with Smith privately, away from her parents. He admitted he carried a .357 magnum, but he said it was for protection from another fellow who lived in the area and who had shot Jarman's brother in 1973. Jarman contended that Bell had the shotgun and that it discharged when the two were struggling. He admitted he struck Smith once in trying to get her off him while he was wrestling with Bell. He testified that Smith's father had a gun, that several shots were fired, and that he threatened Linda only to keep her father at bay long enough to get to the street where he could get away. He also admitted firing shots at Bell before and after the incident in the alley.
Jarman testified that he did not leave for California until the end of the month. He said he did not know the police were looking for him, and he denied that he left the state to avoid arrest.
Assignment of Error No. 1
By this assignment, Jarman claims that the trial court failed to maintain proper sequestration of the witnesses. He contends that state witnesses were in the courtroom throughout the direct examination and half way through the cross-examination of Linda Smith, the state's lead witness. He argues that this was a denial of due process in that it deprived him of an adequate defense and undermined his ability to confront and to cross-examine his accusers.
The record indicates that defense counsel, during his cross-examination of Smith, noticed persons in the courtroom whom he thought might be witnesses. He asked them to be removed if they were. The state claims that the witnesses simply walked in, were spotted, and were asked to leave.
The alleged witnesses were never identified. There was no showing that they were actually witnesses who eventually testified nor that any later testimony was influenced by the alleged violation of the sequestration order. Based on the showing made, this assignment is without merit. See State v. Armstead, 432 So.2d 837, 841 (La.1983). Moreover, defense counsel failed to make a contemporaneous objection. C.Cr.P. 841.
Assignment of Error No. 2
By this assignment, Jarman contends that the trial court erred when it denied his motion for a mistrial due to alleged prejudicial remarks by the prosecutor.
A police detective had testified for the state about his unsuccessful efforts to locate and arrest Jarman after the incident. During cross-examination, Jarman maintained that he did not leave town until November 30, 1977. Before asking further questions about where he stayed before leaving for California, the prosecutor turned to a police detective and said, "Henry, listen. Have you got your pencil and pad because we are going to have some homework to do tonight?" Defense counsel moved for a mistrial which was denied. He did not ask for a cautionary instruction to the jury.
The remarks were gratuitous and improper. Nevertheless, mistrial is a drastic remedy. Unless mandated by C.Cr.P. 770, it is committed to the sound discretion of the trial judge and is warranted only if substantial prejudice results which would deprive a defendant of a fair trial. State v. Narcisse, 426 So.2d 118, 133 (La.1983). Defense counsel did not deem the prejudice sufficient to ask for a cautionary instruction at the time, and the trial judge obviously did not think one necessary, either. Defendant suffered no substantial prejudice by the remarks.
This assignment is without merit.
Assignment of Error No. 3
By this assignment, Jarman contends that reversible error occurred when the prosecutor exceeded the scope of permissible argument during rebuttal argument at the close of the trial. The remarks concerned *1188 the whereabouts of Joseph Bell, the man who had carried the son to the car on the night of the incident.
During closing argument, defense counsel repeatedly referred to Bell's absence. He attempted to use Bell's absence as a means of casting doubt on the state's case. He tried to imply that the state knew where Bell was, or, at least, had the resources to find him if his testimony might have helped the prosecutor. Bell was not called as a witness, defense counsel implied, because his testimony would have supported Jarman's story.
On rebuttal, the prosecutor stated that he did not think Bell's testimony was crucial, given the other testimony. He indicated that Bell had given a statement which did not conflict with the state's version. Moreover, the state's version had Bell running off when the incident began. He implied that defense counsel should have found Bell, if his testimony was so important. The prosecutor then began to tell how he had looked for Bell but could not find him. He thought he was in prison in Folsum, but detectives could not locate him. He then said he could probably get him to court if he had another day.[1]
At this point, defense counsel objected, asked for an admonition, and moved for a mistrial. The jury was retired. Defense counsel objected to everything said which was not in the record. The trial judge questioned the contemporaneous nature of the objection. The prosecutor argued that his remarks were based on the record because defense counsel had dwelled on Bell's absence during closing argument. The trial judge found the remarks to be proper rebuttal. He denied the motion for a mistrial, but he did instruct the jury to disregard the prosecutor's remarks.
The argument of counsel is governed by C.Cr.P. 774. Comments made by a prosecutor which refer to matters allegedly within his personal knowledge but not in evidence are "particularly reprehensible." State v. Prestridge, 399 So.2d 564, 579 (La.1981). Nevertheless, before allegedly prejudicial argument requires reversal, the court must be thoroughly convinced that the jury was influenced by the remarks and that such contributed to the verdict. State v. Sharp, 418 So.2d 1344, 1349 (La.1982).
The thrust of the prosecutor's remarks was intended to downplay the importance of Bell's testimony to counter defense counsel's position that it was crucial. To do so was proper. In so doing, however, the prosecutor referred to an alleged statement by Bell after the incident which was not produced. He claimed that he knew that Bell did not know anything that the other witnesses had not told the jury.
The jury deliberated some three and one-half hours. After one hour, they asked for additional instructions. The verdict was eleven to one. The evidence was close in this case; nevertheless, the jury's verdict is more than defensible on the basis of the evidence which it heard. The jury was admonished by the trial judge, and we are not thoroughly convinced that these remarks influenced the jury or that they contributed to the verdict. Credit should be accorded to the good sense and fairmindedness of jurors who have heard the evidence. See State v. Dupre, 408 So.2d 1229, 1234 (La.1982).
This assignment is without merit.
Assignments of Error Nos. 4 and 5
By these assignments, Jarman contends that the state somehow conspired to *1189 trick him into misidentifying a man in the courtroom as Joseph Bell.
During Jarman's cross-examination, the prosecutor asked him if he knew where Bell was. Jarman replied that Bell was in the courtroom sitting in the audience. Surprised, the prosecutor asked Jarman to point him out, and the prosecutor asked for an instanter subpoena. It turned out that the person identified was Isiah Harris, then the fiancee of Linda Smith. Harris evidently did bear a resemblance to Joseph Bell. During the cross-examination, the prosecutor had Jarman repeat unequivocally before the jury that Harris was Bell.
Jarman argues that this constituted a comment on the credibility of the defendant while creating collateral issues which confused the jury. No doubt, this misidentification did Jarman little good in the eyes of the jury. The jury did, however, hear the testimony that the two resembled each other. It also knew that over five years had elapsed since the incident and that such a mistake was reasonable.
But more importantly, there is simply nothing which substantiates Jarman's charge that he was the victim of some subterfuge by the state. The state did not know who Harris was, either. Once Jarman identified him as Bell, the state had no choice but to put Harris on the stand so that his identity could be discovered. Defense counsel did not even cross-examine Harris to determine whether he was there at the request of the state or a prosecutor.
These assignments are without merit.
Assignment of Error No. 6
Isiah Harris testified that he was in jail at the time of the shooting. At Jarman's motion for a new trial, defense counsel argued that this was false and that he was prejudiced by the jury not hearing the truth. He repeats this argument in this assignment of error.
Assuming it is true that Harris was not in jail at the time, his testimony to that effect did not deprive Jarman of a fair trial.
This assignment is without merit.
Assignment of Error No. 7
By this assignment, Jarman contends that the trial court erred in denying his motion for a new trial based on his claim that the verdict was contrary to the law and evidence. Specifically, he argues that there was no evidence of specific intent to kill.
The gravamen of the crime of attempted murder, whether first or second degree, is the specific intent to kill and the commission of an overt act tending toward the accomplishment of that goal. R.S. 14:27; 14:30.1; State v. Huizar, 414 So.2d 741, 746 (La.1982). Claims that the evidence adduced at trial was insufficient to convict a defendant of a given crime are reviewed under the standards of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). A reviewing court must consider the evidence in the light most favorable to the prosecution in order to determine if any rational trier of fact could have found the elements of the crime beyond a reasonable doubt.
Through the testimony of the victim, the state showed that Jarman threatened to "blow up" Smith one day before the incident. A neighbor saw Jarman in the area on the next day with what appeared to be a gun in a brown paper bag. Jarman himself testified that he had a .357 magnum with him that night. Smith and her father testified that he had a shotgun in addition to the pistol. The shotgun discharged, injuring Smith and her children. Jarman admitted he struck Smith with the butt of the shotgun. Smith testified that Jarman also struck her repeatedly with the butt of the pistol. Jarman pointed the pistol at Smith and her father and threatened both of them. Following the shooting, Jarman went to California.
Based on this showing, any rational trier of fact could have concluded beyond a reasonable doubt that Jarman actively desired to kill when he struck Linda Smith in the head with the stock of the shotgun, when he fired the shotgun at close range, and *1190 when he repeatedly hit Smith in the forehead with the butt of the pistol.
This assignment is without merit.
Accordingly, Frank Jarman's conviction and sentence are affirmed.
CALOGERO, J., concurs, not being in full agreement with the majority's treatment of Assignment of Error No. 2.
LEMMON, J., dissents and assigns reasons.
LEMMON, Justice, dissenting.
This was a credibility contest in which the jury weighed defendant's version of the occurrence against the version related by Ms. Smith and her father.[1] Bell was the only other witness to the incident, and the prosecutor's gratuitous remark that Bell's statement to the police (not in evidence) indicated that Bell knew nothing about the shooting could well have tipped the scale in this 11 to 1 verdict after three and one-half hours of deliberation.[2]
I cannot say that the evidence was so overwhelming that this prosecutorial misconduct in arguing beyond the evidence did not influence the verdict. I would reverse and order a new trial.
NOTES
[1] Before the state called any rebuttal witnesses on the first day of the two day proceeding, the judge and the attorneys discussed whether to hold them over to the next morning. By this time Joseph Bell had become of importance in the case. See the discussion of Assignments of Error Nos. 4 and 5. The state wanted to get Bell there for the next morning, believing him to be in prison in Hammond. Defense counsel objected to the continuance, stating he had a trial the next day. Eventually, it was agreed that the state would call its rebuttal witnesses that evening and reserve its right to put Bell on the stand the next day. Closing arguments took place the next morning. Bell, evidently, could not be found. Presumably, the prosecutor was referring to these failed attempts to locate Bell after court had adjourned on the night before.
[1] According to defendant's version, Bell was the person with the shotgun, and Ms. Smith was injured by a shot from Bell's gun during defendant's struggle with Bell.

Under Ms. Smith's version, Bell had left the scene before the shooting.
[2] The pertinent portion of the prosecutor's rebuttal argument was:

"... The second question, Joe Bell .... it wasn't until yesterday at this defendant's testimony that he focuses on Joe Bell as being a critical witnessas being the person who is responsible for all of this.... Now, you know, ifif my client told me that months agoI don't knowwhen he hired [defense counsel], you know, I would have made an effort to find Mr. Joe Bell. I knew the officers talked to him. He gave them a statement. I knew that. II couldn't find him. He's not here in town anymore, but I also knew that he didn't know anything about the shooting because he was offhe had run off, and I also knew that I had other witnesses who knew about the same thing he did and more. So I'm able to judge the situation, but I didn't go all out to look for him until this came up yesterday. And I will tell [defense counsel] right now. He's in Folsum, Louisiana, which is ininaround Covington out there, and I tried to get him, but he's obviously not here. I obviously wasn't successful. But that's where he is, and I just started looking for him yesterday. But if I had another day's notice, I could bring him here. I'm pretty sure I could have gotten him up here...." (Emphasis supplied.)