WARD, Judge.
Willis Thomas was indicted for the second degree murder of Ernest Ford. A twelve-member jury found him guilty of the lessor charge of manslaughter. The State then filed a bill of information charging Thomas as a multiple offender. The trial court found that Thomas was a second offender and sentenced him to serve twenty-one years at hard labor.
In his appeal Thomas argues that trial error led to an erroneous verdict. Specifically, he contends that several of the State’s attorney’s comments during closing argument were impermissible. He also argues that the trial court erred when it adjudicated him a multiple offender.
Thomas’s most meritorious claim is that during closing argument the State’s attorney made an impermissible statement, arguing facts which were not disclosed during trial and not supported by the trial evidence. Hence he says the trial court erred when it did not sustain his objection and when it did not grant his motion for a mistrial. Thomas’s defense was that this was a justifiable homicide, as defined in R.S. 14:20(1), more commonly called “self defense”. In his defense one of the crucial evidentiary questions was whether the decedent, Ernest Ford, had a gun that Thomas reasonably believed put him in danger of death or great bodily harm, and that the killing was necessary to save himself from that danger. See R.S. 14:20(1). The alleged error goes to the closing argument of the State’s Attorney, who said that a gun was not found because there was no gun. The trial court held that the remarks were *750 permissible as “argument”, not facts supplied by the prosecutor. While we do not entirely agree with the trial court we do not believe the court erred, but if it was error we find that error was harmless beyond a reasonable doubt. If this comment went beyond the evidence the following summary of the evidence shows why it is harmless error beyond a reasonable doubt, within the meaning of Chadwick v. California, 386 U.S. 18, 25, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).
On the morning of July 14, 1990, around seven o'clock, Willis Thomas, Ernest Ford, and several other people were standing outside a bar in a small park bounded by Prytania, Lyons, Perrier, and Upperline Streets. This group of people, many of whom had been drinking all night, had assembled at the park to board a bus to go to a picnic in Biloxi which had been organized by the owner of a bar. Witnesses presented by both the State and the defense agreed that Ford, the defendant Willis Thomas, and another member of the group, Tyronne Braud, were involved in a heated argument. What happened during and after the argument depends upon each witness's version of the facts, and their testimony varies greatly.
Braud says that Thomas knocked him down, hit him with a board, and kicked him unconscious. The defendant, Willis Thomas, testified at his trial. He said he had been drinking all night at a nearby bar. He was standing with a group of people at the park that morning when he was approached by Braud, who demanded that he tell Ford that he [Ford] was a “sissy.” Thomas testified he refused, and said that he did not know Ford. Ford then threatened to kill him, and Ford raised his shirt, revealing a gun in his waistband. Thomas testified he walked away from Ford, and Braud entered a nearby bar. When Braud came out he said something to Thomas, and then tried to hit him, but Thomas dodged the blow. Braud continued trying to hit him, and the two then began fighting. Ford ran up to help Braud, and hit Thomas, knocking him down. Thomas said he fought free, and ran to his bicycle, but Ford ran up and again threatened to kill him. Ford put his hand behind his back, and Thomas admits that he hit Ford with his fist, knocking him to the ground. Ford kept his hand behind his back, and Thomas, fearing Ford was still going to shoot him, picked up the board and hit him in the chest with it. Thomas testified that because Ford’s eyes were still open and he was still moving his arms, he picked up the board to hit him again. However, someone grabbed Thomas from behind, and he just threw the board. He then got on his bike and rode home. He denied riding his bike over Ford, as the State’s witnesses said he did.
Thomas insisted he did not intend to kill Ford or even hit him in the head, but rather he was scared and only wanted to be sure that Ford would not shoot him. He admitted he did not see Ford’s gun when Ford was lying on the ground, but he testified that Ford had his hand behind his back and for this reason he thought Ford might still be armed. Thomas also admitted having prior convictions for simple robbery and burglary. Witnesses for the State say Ford did not have a gun; witnesses for Thomas say he did.
There is no dispute, however, that Ernest Ford died from a blow to the head delivered with a heavy, blunt instrument which fractured his skull. Ford was unconscious for several days and died of complications attributed to the brain injuries. A piece of board described by witnesses as a “log” taken from the park the day after Ford’s death contained a substance which could have been blood. However, analysis of the stain could not verify that the stain was human blood because of the wood’s porous nature.
The board or “log” as the instrument of death was not an issue, however, and Thomas's attorney argues it was used in self defense. He emphasized Thomas’s belief that Ford had a gun, and the testimony of two defense witnesses who said they saw the gun, and that Thomas did only what was necessary to save himself from death or great bodily harm.
*751 In Thomas’s assignment of error he argues that it was error for the State in rebuttal argument to make this comment: “Why did Mr. Davenport say there was no gun? There was no gun found because there was no gun. There was no gun taken off Ernest Ford by the EMT — ” (3/19/91 Supp.Tr. p. 2)
Thomas’s reference to the comment is only partly correct. The Mr. Davenport referred to was a state witness, Theophilus Davenport, who testified that he did not see a gun or any one with a gun. The statement is wrong when it refers to the EMT. As a matter of fact NOPD Officers Hoobler and Livingston, who were the first on the scene, summoned the EMT (Emergence Medical Team) but no one from the EMT testified. Nevertheless, Officer Hoo-bler said he did not find a gun. Thus the statement while incorrect is apparently only an inaccurate account of the initial police investigation, not a statement where the prosecutor is deliberately supplying missing facts. As such, even if this was not permissible argument as the trial court held, and even if it was error not to sustain an objection it was harmless error because the jury must certainly have known who testified as to what in this one day trial. The remarks are harmless unless the reviewing court is thoroughly convinced that the remarks inflamed the jury and contributed to the verdict. State v. Byrne, 483 So.2d 564 (La.1986), cert. den. Byrne v. Louisiana, 479 U.S. 871, 107 S.Ct. 243, 93 L.Ed.2d 168 (1986); State v. Jarman, 445 So.2d 1184 (La.1984); State v. Williams, 575 So.2d 452 (La.App. 4th Cir.1991), writ den. 578 So.2d 130 (1991).
In addition the error is harmless because even considering the facts in the light most favorable to Thomas, and accepting his testimony that “he thought Ford had a gun” it is obvious that when Ford was lying on the ground, dazed, and only semi-conscious, Thomas could not reasonably believe that he was “in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.” Therefore, the homicide was not justifiable under R.S. 14:20(1). Under these circumstances Thomas is guilty of manslaughter by his own testimony, the verdict returned by the jury as a lesser included verdict to the charge of second degree murder.
Thomas also contends that there was trial error when the State’s attorney made another improper argument before the jury. During closing argument the State’s attorney said:
Next you heard from two people in jail. You heard from Cornelius Bell and you , heard from Donald Ray Stevenson. Cornelius Bell and Donald Ray Stevenson both know Willis Thomas’s mother. Mr. Stevenson said in fact he knows him all his life, all his life. Mr. Stevenson says he saw somebody with a gun out there that day. He wasn’t there when the guy was on the ground and out. He had left before that. He walked by there. He said he saw a gun but never tied it to how he knew that was the person who was laid out. Never tied that together. Cornelius Bell, armed robbery conviction, a couple of other convictions — (3/19/91 Supp.Tr. p. 1)
Thomas’s counsel objected, a bench conference was held, and Thomas’s request for a mistrial was denied. Thomas acknowledges that both of these witnesses were in jail at the time of trial, but he notes that steps were taken to keep this fact from the jury, that civilian clothes were provided to these witnesses and their restraints were removed. He argues that the State’s remark about the witnesses’ imprisonment unduly prejudiced him because this “grouping” of the witnesses with the appellant in jail “presented the jury with a reason to suspect collusion.” He argues that although such evidence might be admissible, the suggestion of collusion coming during closing argument deprived him of the opportunity to show the lack of contact between prisoners in a large jail.
The jury was already aware that both of these witnesses were in jail because this fact was elicited during the cross-examination of Stevenson. Although there was no testimony as to Bell having an armed robbery conviction, Stevenson admitted during *752 cross-examination to having an armed robbery conviction and later twice admitted that he had been arrested two hours before Bell had been arrested on the same charge. There were no objections to any of these questions. Thus, although the defense may have made arrangements to conceal the fact that these witnesses were incarcerated, this fact was brought out during Stevenson’s examination without defense objection. Counsel is therefore incorrect in saying he did not have notice that the State could attack his witnesses’s testimony by alleging collusion.
The State may certainly attack the credibility of a witness by showing collusion or the opportunity for it. Evidence or questions that show the witnesses and the defendant were in the same jail before and during trial is relevant to show both an opportunity for collusion and bias in favor of a fellow prisoner, facts the jury may consider when assessing the credibility of witnesses. These questions and comments are not prohibited by C.Cr.P. art. 770. That article refers to defendants, not witnesses. The court did not err by overruling the objection to that part of the State’s closing argument.
By his third assignment of error, Thomas contends that the trial court erred by finding him a multiple offender when the State failed to show that five years had not elapsed between his discharge on the prior conviction and the commission of the present offense. See R.S. 15:529.1 C; State v. Wheeler, 576 So.2d 541 (La.App. 4th Cir.1990), writ den. 578 So.2d 140 (1991) and 580 So.2d 672 (1991); State v. Nasworthy, 542 So.2d 715 (La.App. 4th Cir.1989). It appears on the face of the documents introduced at the multiple bill hearing that five years had not elapsed.
According to the transcript of the hearing, Thomas was sentenced on November 20, 1984, and placed on five years active probation. Thomas argues that the State failed to show that he had not been granted an early release from probation which might have occurred over five years before the commission of the offense in the present case. However, C.Cr.P. art. 897 provides that a court “may terminate the defendant’s probation and discharge him at any time after the expiration of one year of probation” in a felony case. Even assuming that Thomas’s probation was terminated after one year, the present offense occurred less than five years after November 20, 1985 (It occurred on July 14, 1990). In addition, the docket master indicates that the State filed a rule to show cause in that case in April of 1987, showing that he had not been released from probation at that time. Thus, on the face of the evidence introduced at the hearing, it is apparent that five years had not elapsed between the expiration of the appellant’s probation and the commission of the offense in the present case. This assignment has no merit.
Accordingly, we affirm the sentence and conviction.
AFFIRMED.