JAMES F. McKAY III, Chief Judge.
11 Shortly before midnight on January 7, 2010, Carol Belisle, Kewanda Harris, Karen Matthews, and Desmond Harris were shot inside a house at 2721 Urquhart Street. Ms..Belisle survived the shooting; the other three victims did not.
The State charged Charles “Tiger” Franklin and Dwayne J. “Red” Johnson with three , counts of first degree murder. Mr. Johnson pled guilty to a reduced charge of three counts of manslaughter. Mr. Franklin went to trial and was convicted on three counts of first ‘degree murder. He was sentenced to three terms of life imprisonment without benefit of parole, probation or suspension of sentence. Mr. Franklin appealed his conviction, asserting only one assignment of error, prejudicial prosecutorial comments made during closing argument.. For the reasons set forth below, we affirm Mr. Franklin’s conviction and sentence. . ■
STATEMENT OF FACTS:
NOPD Sgt. Michael Rooney testified that shortly before midnight on January 7, 2010, he and Officer Terry Thomas were dispatched to an aggravated burglary in the 2700 block of Urquhart Street. Hé arrived at 2721 Urquhart Street,' where he noticed that the door to'the residence was open. Sgt. Rooney entered and observed a female-lying on the floor in a pool of blood, and another female lying at |athe head of a bed. Both were deceased. Sgt. Rooney observed a wounded third female (Ms. Belisle) lying perpendicular on the bed. The wounded female was unable to communicate. Sgt. Rooney then discovered a young child, who was unharmed, moving under the bed covers. Other police *1224 units arrived and discovered a deceased male victim in the rear yard.
Former NOPD Homicide Detective Harold Weishan testified that he was dispatched to the scene. He indicated that the female victims were located in the first bedroom of the residence. Ballistics evidence retrieved' from the scene included numerous spent shell casings fired by a rifle and others cast off by a hand gun.
Detective David Harris of the FBI Violent Crime Task Force was assigned the task of documenting the rear yard, Where he éncountered the male victim lying face down in the grass with a gunshot wound to the head. • Det. Harris also participated in ■canvasing the neighborhood for witnesses and assisted in the execution of a search warrant for 2710 Urquhart Street, located across the street from the crime scene. A pah- of .boots, tennis shoes, a black/red sweatshirt, and a black long sleeve T-shirt were recovered in that search.
Det. Timothy Bender, the primary detective on the case, assisted in canvassing the area for witnesses, which • produced information that the people living across the street knew who was responsible for the shootings. Det. Bender and other officers spoke to Brittany Walker and Crystal Smith, who resided at 2710 Urquhart Street. Arnold. Wilson, Mallene “Twin” Dilbert, and Johnny Perry were also present in the residence. No one in the home wanted to speak with the officers. However, Ms. Walker and Ms. Smith whispered to Det. Bender that they had information, but could not speak in front of Mr. Wilson and Ms. Dilbert. Det. |sBender accompanied Ms. Walker and Ms. Smith to the homicide office to take their statements. The women identified photographs of Charles ' “Tiger” Franklin and Dwayne “Red” as the shooters. They were acquainted with both men.
Det. Bender returned to the residence the next morning with Ms. Smith and Ms. Walker. At that time, Ms. Walker gave Det. Bender a black plastic container with empty holes and two live rounds of 380 caliber bullets, which she retrieved from a closet. Looking over the crime scene on the morning after the shooting, Det. Bender, along with Detective Winston Harbin, discovered a spent 380 casing in the yard near where Mr. Harris’ body was found.
On January 10, 2010, Det. Bender interviewed Ms. Belisle at University Hospital. She related the events as she remembered them. On January 11, 2010, Det. Bender obtained arrest warrants for Mr. Franklin and Mr. Johnson.[1]
Det. Bender obtained a search warrant for Mr. Franklin’s residence at 2361 N. Villere Street. Mr. Franklin was arrested by the SWAT team at his residence. A search of the residence produced a cell phone hidden in the toilet and a dark colored shirt later identified as belonging to Mr. Perry. A day later, officers returned to N. Villere Street and searched the exterior of the houses in close proximity to Mr. Franklin’s residence. Specifically, a search was made around 2359 N. Villere Street, a house that bordered Mr. Franklin’s residence with no fence between the properties. Behind a pillar at the rear of that house, officers discovered a bag containing numerous rounds of AK 47 assault rifle ammunition.
Forensic pathologist, Dr. Paul McGarrity, testified he autopsied the victims’ bodies. His findings during his January 8, 2010 autopsy of Mr. Harris’ body | indicated that he suffered two fatal .38 caliber gunshot wounds to the head, delivered at close range. Those bullets were retrieved during the autopsy. Ms. Matthews’ body sustained ten gunshot wounds. *1225 Judging by the small entry and large exit wounds to Ms. Matthews’ body, Dr. McGarrity opined she was shot by an automatic weapon. The autopsy of Ms. Harris’ body revealed nineteen gunshot wounds. Dr. McGarrity retrieved two bullets from Ms. Harris’ body, determining that she had been shot by a rifle.
Now retired NOPD firearms examiner Sgt. Byron Winbush examined twenty pieces of ammunition related to this case — ■ fifteen spent AK-47 rifle casings, four spent bullets and one copper jacket bullet. Sgt. Winbush also examined two rifle bullets retrieved during the autopsy of Ms. Harris’ body and concluded both bullets were fired by the same weapon. Sgt. Win-bush’s examination of the two 380 caliber bullets retrieved during .the autopsy of Mr. Harris’ body caused him to conclude that the bullets were fired by the same handgun. As for' the fifteen AK-47 cartridge casings recovered from the shooting scene, Sgt. Winbush noted that all the casings were fired by the same weapon. In conclusion, Sgt. Winbush indicated that one AK-47 rifle and one 380 caliber gun were used in these shootings.
Ms. Belisle, the fourth shooting victim, testified that she, Mr. Harris, Ms. Harris, and Ms. Matthews, were living at 2721 Urquhart Street on January 7, 2010. Ms. Harris sold drugs (crack, she believed) to make ends meet. They were home on the" night of the shooting, along with Ms. Matthews and Ms. Harris’s two year-old godchild. About 11:30 p.m., Ms. "Matthews, Ms. Harris, and the child were asleep in one bedroom. Ms. Belisle was in another room, when she heard someone knocking at the back door. Ms. Belisle opened the door and saw only shadows, so 15she slammed and locked the door. She was frightened and told Mr. Harris, who exited the front door,' leaving it unlocked. He walked through the alley to the rear yard. Ms. Belisle returned to her bedroom. As she watched television, she felt someone standing over her. The person had a hoodie on with a scarf over his face and a small black or silver gun pointed in her face. She screamed, waking Ms. Harris and Ms. Mathews. At that time, Ms. Matthews screamed because a second person armed with a rifle, or “long gun” entered the house. Both assailants were dressed in black with their faces covered. They demanded money and drugs from the three women. Ms. Matthews gave the man something, but it was not enough. The assailant with the rifle instructed the other assailant, who had a red complexion, to go outside and “do what was planned.” Approximately ten seconds later, Ms. Beli-sle heard' gunshots outside and assumed that Mr. Harris had been shot. The assailant with the red complexion came back into the house and stood next to Ms. Matthews, as the assailant with the rifle began to count: When he reached the number ten, he shot Ms. Matthews. Ms. Belisle testified that when the assailants began shooting, she hid under the covers and played dead. She was shot in the leg. The shooters ran from the house. Ms. Belisle screamed for help and called 911. She was unable to give a description of the assailants.
While in the hospital, Ms. Belisle gave Det. Bender a description of the shooters. Specifically, she stated that one. had a red complexion and was smaller; the other one was taller and had a darker black complexion. At trial, Ms. Belisle testified that the man with the long gun was not wearing gloves. This contradicted her statement to Det. Bender, three days after the shootings.
Ms. Walker testified that in January 2010, she was living at 2710 Urquhart Street with Ms. Smith and Mr. Perry. On occasion, Mr. Franklin, Mr. Johnson and Lsome of their friends would stay 'at the *1226 residence. Ms. Smith had a relationship with both Mr. Franklin and Mr. Perry. She said that some of the people who hung out at her house had guns — an AK-47 and a 380. She took a picture of Ms. Smith and Mr. Johnson posing at the house with a,n AK-47 rifle. On another occasion, Ms. Walker said she saw Mr. Franklin with an AK-47 and Mr. Johnson with the smaller gun, the 380. She knew that Mr. Franklin and Mr. Johnson sold drugs.
Ms. Walker stated that sometime prior to the shooting, two of the female victims got into an argument with Mr. Franklin over the sale of crack cocaine, One of the females accused Mr. Franklin of stealing from their house. After that .incident, Mr. Franklin and Mr. Johnson often watched the victims’ house because the women told people that they got drugs from Mr. Franklin and were stealing his clientele.
Ms. Walker recalled that on the day of the. shooting, she was at home with her daughter, Ms. Smith, Mr. Franklin, Mr. Johnson, and Mr. Wilson. She stated that Mr. Franklin and Mr. Johnson had their weapons (the AK-47. and the 380) with them at her house. After Mr. Perry came home fi;om work later that afternoon, Mr. Franklin and Mr. Johnson left the house, each wearing some of Mr. Perry’s black clothing, including gloves and shoes. They were armed with the AK-47 and the 380 weapon. Mr. Franklin left some of his shoes at the residence. Mr. Wilson, who was also present at the time, left around the same time as Mr. Franklin and Mr. Johnson. Within five minutes of the men leaving, Ms. Walker heard five or six gunshots. Mr. Wilson returned to Ms. Smith’s residencé shortly after the shootings, Mr. Franklin and Mr. Johnson did not return.
Ms. Walker testified that after the police arrived on the scene, Ms. Smith spoke with Mr. Franklin on the telephone. He was asking Ms, Smith to tell him |7who was in the area, what was going on, and if they had seen anything. Ms. Walker and Ms. Smith were handcuffed and taken to headquarters. They gave a statement to police and identified pictures of Mr. Franklin and Mr. Johnson and described the two men’s previous altercation with the victims’.
Ms. Walker further stated that shortly after the shootings, Ms. Dilbert, Mr. Franklin’s girlfriend, came to the house asking to borrow sugar¡ Neither Ms. Walker nor Ms. Smith had ever met Ms. Dilbert before. Ms. Dilbert spoke first to Mr. Wilson, and the two passed a cell phone back and forth between one another as they spoke to Mr. Franklin on the other end of the line.
Mr. Perry testified that he moved in with Ms. Smith and Ms. Walker in January 2010. Mr. Perry knew Mr. Franklin and Mr. Johnson from their frequent visits with Ms. Walker and Ms. Smith. He recounted that prior to the shooting, Mr. Franklin and Mr. Johnson had a minor verbal .altercation with two of the women across the street about some drug transactions. The four of them were involved in dealing drugs on the street. Mr. Perry recalled giving a statement to Det. Bender in which he said he heard Mr. Johnson say he was going to the kill Mr. Harris.
On the day of the shootings, Mr. Perry returned from work about 6:30 p.m. and found Mr. Franklin, Mr. Johnson and Mr. Wilson visiting with Ms. Walker and Ms. Smith. Mr. Perry noticed that Mr. Franklin and Mr. Johnson were wearing his black clothing, shoes and work gloves, but he made no mention of it at the time. He also recalled that Mr. Franklin had a skull cap, designed to be worn over his face. "He noted that the two men were armed with an SK (Chinese chopper/rifle) and a 380 weapon. Mr. Perry went to bed between 8:30 and 9:00 p.m. that night. |sHe gave the police a statement sometime after the shootings and met with Det. Bender to *1227 identify a black shirt he owned that was taken by Mr. Franklin.
Under cross-examination, Mr. Perry expressed the belief that Mr.-Franklin and Mr. Johnson were setting him up to take the blame for the shootings by wearing his clothing and having him hold their guns, especially considering that the two men did not touch their guns without gloves after Mr. Perry had touched them. On redirect, Mr. Perry stated that Mr. Franklin called him after the shootings and told him to put on the news.
The State called Phillip Simmers, who was qualified as an expert in the field of forensic DNA analysis and worked for the Louisiana State Police Department Crime Laboratory. Mr. Simmers identified a copy of the report issued by a serologist in his laboratory.[2] A black long sleeve shirt, a black hooded sweatshirt, a pair of brown boots, a pair of white, green and black shoes, a pair of latex gloves, a pair of black shorts, a black long sleeve shirt, a black T-shirt, a black T-shirt with a red and black design on the front, a black jacket, and a black long sleeve T-shirt were submitted for a serology analysis. Swabs from the articles of clothing, along with two hairs, were also submitted for a serology analysis. The items that were tested were found negative for blood. .
Mr. Simmers explained that a cutting had been taken from the long' sleeve black T-shirt, and that the shirt was initially submitted to the lab for testing without the removed portions; The cutting was later submitted to.the crime lab for separate testing, and was identified in the serology analysis .as possibly containing blood. laAfter reviewing the, report, Mr. Simmers conducted a DNA analysis on the cutting. Mr. Simmers obtained reference blood samples from the victims and oral reference swabs from Mr. Franklin and Mr. Johnson. Mr. Simmers stated that from the cutting of the long sleeve black T-shirt, he identified a single' contributor DNA profile, which was consistent with the DNA profile obtained from Mr. Franklin. Mr. Simmers calculated the odds that the sample would have come from anyone other than Mr, Franklin were one in 36.7 quintillion of the black population.
- The defense called Mr. Wilson to testify. Mr. Wilson stated that he was not charged with any of the murders. He testified that in January 2010, lived in Metairie, but stayed at Ms. Walker’s house some nights. Mr. Wilson spent the night before the shootings at Ms. Walker’s house. He stated that Mr. Franklin and Mr. Johnson were also there on the day of the shootings, but he could not remember what time Mr. Franklin came and went from Ms. Walker’s house. Mr. Wilson denied seeing any weapons at Ms. Walker’s house prior to the shootings. He stated that he did not wear anyone else’s clothing that night and did not participate in a robbery or killing.
Mr. Wilson denied calling Mr. Franklin on the night of the shootings. He did see Mr. Franklin the following day when Mr. Franklin came to his house asking about a pair of boots left at Ms. Walker’s. house. They did not discuss the shootings. Mr. Wilson,, saw Mr. Franklin on-.the docks prior to trial, and Mr. Franklin accused him of being a rat.
Mr. Johnson testified for the defense. He acknowledged that he pled guilty to manslaughter and received a thirty-five year sentence. He stated that Mr. Franklin had nothing to do with the shootings.
*1228 1 ínMr. Johnson said he was at Ms. Walker’s . house on the day of the shootings along with Mr. Franklin, Mr. Wilson, and Paul Spooner. Mr. Johnson said he and Mr. Spooner (who had been murdered pri- or to this trial) and a third man (whom Mr. Johnson refused to name because that man was still alive) planned to pull off an armed robbery on January 7, 2010. At approximately 9:00 p.m., Mr. Johnson, Mr. Spoon-er, and Mr. Wilson left Ms. Walker’s house. He said that Mr. Franklin was not with them. After walking around the neighborhood for about an hour, Mr. Johnson, Mr. Spooner, and the third man went to the victims’ house. Mr. Johnson and Mr. Spooner were armed with hand guns. The third man carried an AK-47. The three men were dressed in black clothing and wore gloves and face coverings at the time of the shootings. Mr. Johnson denied that any of the shooters wore clothes belonging1'to Mr: Perry. The three men went to the victims’ house and knocked at the back door. No one answered, but a man (Mr. Harris) came around from the front of the house into the rear yard. They pointed their guns at Mr. Harris and told him to stay put. Mr. Johnson and the third man entered the house through the front door where they encountered a female in the bedroom. They demanded drugs and money. Mr. Johnson left the house while the third man watched the two females. Mr. Johnson walked into the rear yard where Mr. Spooner had Mr. Harris on the ground. Mr. Johnson heard multiple gunshots fired inside the house. At that point, Mr. Johnson shot Mr. Harris in the head. Mr. Johnson and Mr. Spoon-er jumped over some fences and fled. Three days after the shooting, Mr. Johnson fled to New York, but later returned to New Orleans and turned himself in.
Mr. Johnson said that he first gave defense counsel Mr. Spooner’s name while incarcerated at Hunt Correctional Center, which was after Mr. Spooner’s In death and Mr. Johnson’s guilty plea. Mr. Johnson stated that he was willing to give up Mr. Spooner’s name because he was dead.
Mr. Johnson also said that the third man who participated in the shootings was still alive, but defense counsel promised not to ask him to identify the man in order for Mr. Johnson to testify at this trial.
During further questioning, Mr. Johnson denied that the murders had anything to do with the victims being in competition with him and Mr. Franklin in the sale of drugs. He stated that murder was never intended, only robbery.
Under cross-examination, Mr. Johnson admitted that the prosecutor did not visit him in Hunt Correctional Center or promise that he did not have to name the third man. When asked, Mr. Johnson again refused to name the third man. Mr. Johnson claimed that when he pled guilty in this case, he did not mean to implicate Mr. Franklin, although Mr. Franklin’s involvement was stated in the factual basis for the plea. Mr. Johnson admitted that although Mr. Franklin’s defense attorney said in opening statement that Mr. Wilson was one of the shooters, he maintained that Mr. Wilson was not the third man.
Mr. Johnson claimed that he was testifying in this case because he did not want an innocent man (Mr. Franklin) to serve time for something he did not do. Mr. Johnson acknowledged that Mr. Franklin had been in jail four years before he (Mr. Johnson) chose to tell anyone that Mr. Franklin was not involved.
Mr. Franklin testified on'his own behalf and denied his involvement in the murders. ’ He said that he was living on N. Villére Street at the time of the murders, but often hung out on Urquhart Street selling crack and cocaine. Mr. Wilson, Mr. Johnson, Mr. Perry, and Mr. Spooner would also frequent the house on Urquhart *1229 Street. Mr. Franklin said that there was an AK rifle at Ms. Walker and Ms. | laSmith’s house that everybody would handle or play with. Mr. Franklin denied that the rifle was his. Mr. Franklin also denied taking Mr. Perry’s clothes. Mr. Franklin said he knew of the victims, but never had any disagreements with them.
Mr. Franklin testified that on the night of the murders, his girlfriend, Ms. Dilbert, went to Ms. Walker’s residence to pick up her cell phone that Mr. Franklin had left there. He stated that he accompanied her only part way to Ms. Walker’s house because the police were already on the scene. He stated that the next day, Mr. Wilson came to his house and told him about the murders. Mr. Franklin denied that he went to Mr. Wilson’s house that day asking about his boots.
On cross-examination, Mr. Franklin stated that he left Ms. Smith’s residence that night between 8:00 and 10:00.m. and went to his home on N. Villere Street where he hung out with Ms. Dilbert and her daughter for the rest of the night. (The murders occurred around 11:45 p.m.).
The State called Ms. Dilbert on rebuttal. She contradicted Mr. Franklin’s account of the night of the murders. Ms. Dilbert testified that she worked until 9:30 p.m. that night. She stated that it was late when she got off the bus so she called Mr. Franklin to meet her. Mr. Franklin instructed her to walk to Ms. Smith’s house to borrow sugar. Ms. Dilbert did not know Ms. Smith or Ms. Walker. When she arrived at their residence, she saw numerous police officers near the house. After speaking with police, Ms. Dilbert walked to her house on N. Villere Street where she met Mr. Franklin sometime after midnight.
ERRORS PATENT:
A review of the record for errors patent reveals none. •
LgDICUSSION:
In his-sole assignment of error, Mr. Franklin asserts that he was deprived of a fair trial due to prosecutorial misconduct during the State’s closing argument. More particularly, he argues that the prosecutor made outrageous and prejudicial comments, suggesting that Mr. Franklin’s defense counsel conspired with Mr. Johnson and colluded with Mr. Johnson’s attorney to have Mr. Johnson commit perjury during this trial.
Mr. Franklin maintains that defense counsel twice objected to the prosecutor’s improper comments, but that the trial court failed to instruct the prosecutor to refrain from making such comments. Mr. Franklin asserts that the prosecutor’s comments and argument influenced the jury and contributed to the verdict. Moreover, Mr. Franklin contends that by characterizing defense counsel as willing to present perjured testimony, the prosecutor tainted the entire defense and the testimony of all favorable witnesses.
Mr. Johnson acknowledged during his guilty plea colloquy that the factual basis for his plea was that he and Mr. Franklin committed the murders. However, he testified before the grand jury that he acted alone. At trial, Mr. Johnson testified that Mr. Spooner, and a third man, who was still alive and whom he refused to identify, carried out the shootings. Mr. Johnson acknowledged that Mr. Franklin’s attorney met with him after Mr. Franklin’s attorney secured . Mr. Johnson’s attorney’s permission to do so. During that meeting, Mr. Johnson agreed to testify at this trial, but refused to divulge the name of the third man.
In rebuttal argument, the State suggested to the jury that after Mr. Johnson realized he would be labeled a “rat” and treated accordingly in prison for admitting luthat Mr. Franklin committed the mur *1230 ders with him, Mr. Johnson decided to implicate Mr. Spooner. The State advanced this. theory in rebuttal as follows:
. Prosecutor: So use your common sense and ask yourself would they treat rats good in jail? Is it likely that a person who would rather spend thirty-five years based on yesterday, much longer than that, in jail as a “rat” or rather than spend that time not being a rat? I would submit to you that a person would rather spend life in prison and not be a rat then spend thirty-five years in prison as a rat.
You see that is the choice that Red [Mr. Johnson] had to make. Because on August 19th of this year when he stood up ‘in front of this very Judge and he raised his hand to tell the truth, the whole truth and nothing but the truth when he pled guilty. And the factual basis was provided that on January 7, 2010, you and Charles Franklin went into the house at 2721 Urquhart and- murdered . Kawanda Harris, Desmond Hands and Karen . Matthews. The Court then asked him:' “Do you understand the factual basis?” ‘Yes, I do, your Honor.” “Are you pleading guilty to that?” “Did you do that?” “Is that what happened?” "Yes, your Honor, that is exactly what happened.”
He took his plea. Put him in his cuffs and took him down on the docks and brought him back to jail.
Now, it [is] starting to set in. I am a rat now. I can’t be a rat. I can’t be a rat.’ This is not going to be good. Thirty-five years as a rat is not going to be good. Man, take it to the grand jury'. It wasn’t Tiger [Mr. Franklin]’. It wasn’t anybody. I pulled off this whole thing by myself. I went in the house by myself. I did it all by myself.
Talk to defense counsel. Based on the evidence that doesn’t make sense. Two guns? I couldn’t fire the AK in one hand and a pistol and holding people hostages in multiple places, I got to make the story fit this.
Okay, I got it. Let’s blame it on the dead guy. It’s not really ratting if you blame it on the third guy, on the dead guy. Let’s start running addresses and find anybody who has ever been convicted and had a criminal record in the neighborhood. Aha! We find a guy on the corner of this house. That necessarily doesn’t work out too well because Paul Spooner is light skin. So well, he was the guy that was in' the back yard. Blame it on the dead guy.
Look, I promise you this. You can come to court and testify even though you are going to swear to tell [the] truth, the whole truth and nothing but the truth, you don’t have to answer some questions if ybu don’t want to answer them. •
Defense counsel: Your honor, I am certainly going to object to what the Prosecutor is arguing to the jury that I conspired and tried to have the witness commit perjury, if that is what he thinks and in any way is suggesting to this jury—
The Court: Ladies and gentlemen, if that is what you are thinking, 11fithen I order you that has nothing to do with this.
Prosecutor: And just -for the record, I never said that.
When Arnold Wilson testified, you all never had a ‘proper introduction but there was a guy with a suit on standing right next to him the whole time. It is called his attorney. There was a possibility that Arnold Wilson might incriminate himself in some way so he had counsel with him.
*1231 You see the defense was interested in what Dwayne [Mr. Johnson] had to say, but they knew he had given two statements under oath. You know what I like to think that they keep saying that this case has nearly gone on for five years. But guess what? Not only has Tiger’s case gone for five years but Red’s case went on for five years up until a couple of weeks ago. I guarantee you, defense attorneys, they work a hell of a lot closer with each other than they do with the State. They knew David Capasso’s number—
Defense counsel: Your Honor, this is getting to be the very same argument that he has made. He is arguing that we are sitting there conspiring with other defense attorneys.
The Court: Ladies and gentlemen, you consider the evidence, what the evi- . dence is. This is closing argument. This is not evidence. Go ahead. ,
Regarding prosecutorial misconduct during closing argument, the Louisiana Supreme Court has set forth the following:
The general rule concerning the scope of closing arguments is that they are confined to “evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.” La. C.Cr. P. art,-774. Louisiana jurisprudence . on prosecutorial misconduct allows prosecutors wide latitude in choosing closing argument tactics. See State v. Marlin, 539 So.2d 1235, 1240 (La.1989) (holding closing arguments that referred - to “smoke screen” tactics and defense as “commie pinkos” inarticulate but not improper); State v. Copeland, 530 So.2d 526, 545 (La.1988) (holding prosecutor’s waving gruesome photo at jury and urging members to look at it if they became “weak kneed” during deliberations as not improper). Further, .the trial judge has broad discretion in controlling1 the scope of closing arguments. State v. Prestridge, 399 So.2d 564, 580 (La.1081). And, even if the prosecutor exceeds these bounds, the court will not reverse a conviction unless “thoroughly convinced” that the argument influenced the jury and contributed to the verdict. See State v. Martin, 93-0285, p. 17 (La.10/17/94), 645 So.2d 190, 200; State v. Jarman, 445 So.2d 1184, 1188 (La. 1984); State v. Dupre, 408 So.2d 1229, 1234 (La.1982).
■ImEven if we were to assume that the prosecutor’s comments in this case were outside the proper scope of closing arguments, the defendant is still not entitled to relief. The court must be thoroughly convinced • that the argument influenced the jury and contributed to the verdict before reversing a conviction based on misconduct during the closing arguments. ,
State v. Casey, 1999-0023, p. 17 (La.1/26/00), 775 So.2d 1022, 1036.
Moreover, this. Court has recognized that “[e]ven when the prosecutor’s statements are improper, a reviewing court should accord credit to the good sense and fairmindedness of the jury that heard the evidence.” State v. Webb, 13-0146, p. 27 (La.App. 4 Cir. 1/30/14), 133 So.3d-258, 276 (citing State v. Harvey, 08-0217, p. 4 (La.App. 4 Cir. 5/13/09), 12 So.3d 496, 499).
In this case, a review of the record indicates that the majority of the State’s arguments consisted of a balanced presentation of the defense counsel’s interaction with Mr. Johnson. Defense counsel specifically had Mr. Johnson confirm that no promises were made with regard to testimony defense counsel would seek to obtain during trial, and to verify that defense counsel absolutely wanted nothing more *1232 from Mr. Johnson than truthful testimony, which Mr. Johnson assured the court he had given.
The record also clearly demonstrates that the trial judge instructed the jurors, at the commencement of trial and prior to handing the case over for their deliberation, that the attorneys’ arguments were not evidence. Likewise, the trial judge admonished the jury in the same vein when defense counsel objected to the State’s closing arguments.
After reviewing the prosecutor’s closing argument, and considering the entirety of the record, we find that the jury verdict was reasonable, based on the overwhelming evidence presented by the State and the lack 'of evidence to | ^corroborate the defense’s theory of the case. In sum, nothing that Mr. Franklin has claimed demonstrates that the prosecutor’s comments so influenced the jury and contributed to the verdict, such that would warrant a reversal of Mr. Franklin’s conviction and sentence. This assignment of error is without merit.
CONCLUSION:
Mr. Franklin has failed to show any reasonable likelihood that the comments made during the prosecutor’s closing argument influenced the jury verdict. Accordingly, for the reasons stated herein, we affirm Mr. Franklin’s conviction and sentence.
CONVICTION AND SENTENCE AFFIRMED

. Mr. Johnson turned himself in with his attorney.

. According to Mr. Simmers’ testimony, a serology analysis is first performed to identify biological fluids, i.e., blood, semen, saliva or even contact DNA from just touching something. If that testing is positive, the stains are then sent on for DNA testing.