Judge Regina Bartholomew-Woods
hOn September 2, 2010, Joshua I. Lee (“Defendant”) and his brother, co-defendant Christopher Lee, Sr. (“co-defendant”), were charged by grand jury indictment with second degree murder, in violation of La. R.S. 14:30.1, attempted second degree murder, in violation of La. R.S. 14:30.1 and La. R.S. 14:27; and aggravated burglary, in violation of La. R.S. 14:60. On October 1, 2013, co-defendant, through counsel, requested a severance, which the trial court granted. Defendant’s separate jury trial commenced on May 18, 2015, and concluded on May 22, 2015, *1267 with a verdict of guilty on all counts. Defendant waived sentencing delays, and the court imposed sentence on June 23, 2015. Defendant received twenty years in the Department of Corrections with .credit for time served on his aggravated burglary conviction; twenty-five .years in the Department of Corrections without benefit of parole, probation, or suspension of sentence on his attempted second degree murder conviction; and life in the Department of Corrections without benefit of parole, probation, or suspension of sentence on his second degree murder conviction. All sentences were ordered to run concurrently.
^Defendant now timely appeals, alleging two assignments of error. For the reasons that follow, we affirm.

FACTUAL BACKGROUND

Defendant’s charges arose from the burglary of Chad Huth’s home on Cameron Boulevard in Gentilly, New Orleans, resulting in Mr. Huth’s death and injury to Christopher Wells.
Paul Patin, a friend, testified that at the time of the incident he had been living with Mr. Huth at Mr. Huth’s residence. In the early morning hours of April 22, 2010, Mr. Patin was watching television in the living room with Mr. Huth and two of their friends, Antar Breaux and Christopher Wells. Mr. Patin stated there was a knock on the door. When Mr. Patin opened the door, he saw a group of possibly six men he did not recognize. Mr. Patin 'tried to close the door, but the men began to force the door open, breaking the doorjamb. At that point he heard a gunshot. Mr. Patin testified that he slid to the floor as the door was forced open, but was able to crawl to his room. He locked his bedroom door and began to look for his gun, but could not find it. He then jumped out the window and hid under his neighbor’s house, hearing multiple gunshots as he was hiding. He remained there until he heard Mr. Wells screaming. He testified that he left his hiding place and entered the house from the back. As he walked through his house to the front, he saw blood. Mr. Patin walked out the front door and found Mr. Wells crying in front of a neighbor’s house. He stated that the police began to arrive at that time.
Mr. Patin spoke with New Orleans Police Detective Ryan Aucoin and gave a recorded statement. He also assisted a member of the New Orleans Police Department (“NOPD”) compile a sketch of two of the perpetrators. The NOPD showed Mr. Patin three lineups, and he made an identification in two of the Islineups, identifying both Defendant and co-defendant. Mr. Patin also made an in-court identification of Joshua Lee as one of the men he saw on the porch on the night of the incident.
Christopher Wells testified he would routinely go directly from work in Hammond to Mr. Huth’s home. Mr. Wells stated Mr. Huth was like a brother to him. He was at Mr. Huth’s house watching television with him, Paul Patin, and Antar Breaux on the night of the incident. They were expecting some other friends, so when they heard a knock at the door, Mr. Patin went to the door and cracked it open to look out. Mr. Wells explained that, as the door was opened, a group of possibly five men barged into the house. He saw Mr. Breaux immediately run out the back door; simultaneously, Mr.' Huth got up from the sofa and began to move away from the door.
Mr. Wells stated when he heard the first gunshot, he ran toward Mr. Huth’s room. As he was running, he looked back and saw more shots being fired in the direction Mr. Huth was running. While in Mr. Huth’s room, he began looking for Mr. Huth’s gun but was unable to find it, so he *1268 hid behind the door. Eventually, an individual grabbed him and brought him into the living room area of the house. As he was approaching the living room from the hallway, he saw shots being fired in the direction of the bathroom located in the back of the house.
Mr. Wells testified that the men brought him into the hallway in front of the locked door of Mr. Patin’s room, but he refused their demand to open it. He stated that one of the men kicked the door open, which revealed that the room was empty. One of the men, wearing dreadlocks, asked him where the money was kept, and Mr. Wells pointed to the dresser. Mr. Wells testified that the other man, who he later identified as Joshua Lee, put him up against the wall, put a gun to his head, Land pulled the trigger, but the gun jammed and did not fire. Mr. Wells stated that he moved toward the middle of the room, and the man with dreadlocks fired the gun at him multiple times.
Mr. Wells testified that he sustained significant graze wounds to his chest and shoulder, as well as a through-and-through wound to his arm, causing a loss of a great deal of blood. After the perpetrators fled the scene, he locked the front door and began to look for his cell phone to call for help, but he could not find it. He beat on the locked door of the bathroom but there was no response. Mr. Wells then left the house and went to knock on his neighbor’s door, but no one answered. He stated that he subsequently went back into Mr. Huth’s house but was still unable to find either his phone or Mr. Huth, so he went back outside and tried a different neighbor, who was already calling 911.
Mr. Wells later learned that Mr. Huth had been killed. He went to the NOPD homicide office and gave a statement after being released from the hospital. Detective Aucoin showed him photographic lineups, but he was unable to identify anyone. However, after the arrest warrants were issued for Joshua and Christopher Lee, he informed the police that he was “100 percent certain” the two suspects were the perpetrators. Mr. Wells made an in-court identification of Joshua Lee, describing him as the short-haired individual who held a gun to his head. On cross-examination, Mr. Wells acknowledged that, on the night of the incident, when he was interviewed in the hospital, he had not told the police one of the men put a gun to his head.
Antar Breaux testified he knew Mr. Huth and Mr. Wells through his friend, Mr. Patín. He stated he was at Mr. Huth’s house on the evening of the incident watching television with them. He similarly explained that Mr. Patín went to Lanswer a knock at the door, and that Mr. Patín tried to close it but he was receiving resistance from someone pushing back on the door. He realized someone was trying to kick the door down, and when it started to crack, he ran out of the back door of the house. Mr. Breaux heard one gunshot as he was running out and another after he was out of the house. He ran to Elysian Fields Avenue and collected himself for a moment, then returned to the scene, where he saw Mr. Wells clutching his shoulder and knocking on the neighbor’s door. Mr. Patín was also outside the house, and emergency services and the police arrived soon thereafter. When a police officer asked him if he was “attached to the scene,” he told the officer he was not. He explained he was afraid and “did not want to be a part of it,” so he got in his car and left. Mr. Breaux was later contacted by the NOPD. The police had found his phone at the scene and used it to locate him. Mr. Breaux gave a recorded statement to Detective Aucoin, telling him he did not see any of the assailants because he had quickly run out of the house. Mr. Breaux also acknowledged on the stand that he had *1269 been arrested on a material witness bond in North Carolina.
Detective Aucoin of the NOPD homicide division testified that he was the lead investigator on the case. He explained the fire department had to remove the door to the bathroom where Mr. Huth’s body was found, and that the police found ballistic evidence in the residence. Detective Au-coin explained Mr. Huth suffered a through-and-through gunshot wound and that the projectile lodged in the wall in the living room. He stated it was a 9-millime-ter caliber projectile, and that there was a copious amount of blood in the bathroom where Mr. Huth’s body was found. The police also found projectiles that had been fired from a .40-caliber handgun in Mr. Patin’s room where Mr. Wells had been shot multiple times. He interviewed Rail three of the surviving victims, noting that Paul Patín and Christopher Wells gave consistent physical descriptions of two of the perpetrators.
Detective Aucoin learned Mr. Wells[1] phone was in the house at the time of the incident, and that the phone was still in use, but with a different SIM card. The card was traced through subscriber information to Joshua Lee. The detective obtained a warrant to search the Algiers home on Hendee Street where Joshua Lee lived with his family, including his younger brother, L.L.[1] After executing the warrant, the police recovered three firearms, all from L.L.’s bedroom, one of which was found under L.L.’s bed. The gun was a black semiautomatic Makarov brand handgun. L.L. was in the residence at the time the search warrant was executed, but Joshua Lee was not. L.L., who was sixteen years old at the time, was arrested for possession of a firearm by a juvenile after he admitted ownership of one of the guns. He did not admit to owning the Makarov, however.
Detective Aucoin compiled the various photographic lineups with Joshua Lee, Christopher Lee, and L.L., after executing the warrant. The photographic lineups were shown to Mr. Patín and Mr. Wells. Mr. Patín identified both Joshua and Christopher Lee from the lineups. Mr. Wells was unable to make any identification from the photographic lineups.
Detective Aucoin subsequently obtained arrest warrants for Joshua and Christopher Lee, and both were apprehended a couple of weeks later. The detective testified that the firearms discovered at Mr. Huth’s home were a 9-millimeter and a .380-caliber. Both guns were tested and found not to match any of the ballistics ^evidence found at the scene. On cross-examination, Det. Aucoin admitted the coroner wrote the bullet that went through the body of Mr. Huth was possibly a .40-caliber.
Dr. Cynthia Gardner testified that she performed the autopsy on Chad Huth. She explained Mr. Huth’s death occurred as a result of a single perforating gunshot wound to his back which injured his ribs, lungs and his heart. She stated that the bullet went through him and was of an unknown caliber.
L.L. testified that he did not remember telling the homicide detective in a recorded statement that the Makarov handgun found in his room belonged to his brother Joshua Lee. The State then played L.L.’s recorded statement. On cross-examination, L.L. claimed he simply told the detective whatever he wanted him to say, and that he had no knowledge of how the Makarov handgun came to be in his room. He stated he had not seen Defendant carrying the *1270 weapon around. On re-direct, L.L. said the whole statement he gave to police was a lie. L.L. acknowledged he had a second degree murder charge pending against him stemming from an unrelated incident. He stated that he did not know what kind of cell phone his brother Joshua Lee used or whether he shared the cell phone with his other brother Christopher Lee. L.L. also explained that “Keyshawn” was the name of Christopher Lee’s “baby’s mama.”
Loretta May of the AT & T National Compliance Center testified that she is an analyst and legal custodian of records. AT & T received a subpoena for phone records from the State and the subpoenaed records were provided. She explained that a SIM card stores the customer’s phone number, text messages and other data, and that Mr. Wells was' the recorded user of the physical phone registered with AT & T. Mr. Well’s SIM card was last used in the physical phone on April 22, |R2010, at 1:38 a.m. She stated that a new SIM card registered to a Keyshawn Sterling was placed in the phone on April 22, 2010, at 10:18 a.m. and that a single call was made using that SIM card. Ms. May testified a SIM card registered to Joshua Lee was placed in the phone and numerous calls were made using that SIM card. She further testified the SIM card registered to Joshua Lee was associated with an address on Hendee Street and that the SIM card under Joshua Lee’s name was placed in different physical equipment on April 27, 2010, then moved into the equipment originally associated with the account on June 3, 2010.
Byron Winbush testified next, explaining he was employed by the NOPD Crime Lab in 2010. He was admitted as an expert in the field of firearm examination over the objection of the defense. Mr. Winbush testified that based on his observations of markings on a cartridge easing and projectile recovered from the scene, he was of the opinion that it was fired from the 9-millimeter Makarov handgun recovered by the NOPD from L.L.’s bedroom at the home on Hendee Street.
For the defense, Katie Carter, a staff investigator for the Orleans Public Defenders Office, testified that she interviewed Joshua Lee as a possible witness in an unrelated murder trial in which Jamaal Tucker was the defendant. Ms, Carter stated that she was in constant contact with Joshua Lee on Tuesday, April 20, 2010, through Thursday, April 22, 2010, the day he testified in the Tucker case. ■She stated that on Wednesday, April 21, 2010, Joshua Lee spent the whole day in her office. She dropped him off at about six. or seven o’clock that evening at his mother’s house in the Fischer Housing Project on the West Bank. When she went to pick him up the next morning, Joshua Lee was not there. She stated that she left, and when she returned, Defendant was sitting on the porch. Defendant explained [ahe had gone to get his State I.D. card or driver’s license. She believed Defendant had the same phone with him every day. On cross-examination, Ms. Carter denied that her office was planning to use Joshua Lee as an alibi witness for Jamaal Tucker. She stated that Mr. Tucker was convicted, but the conviction was set aside on appeal due to prosecutorial misconduct. Mr. Tucker later pled guilty to manslaughter. Ms. Carter acknowledged that she was not near the: Defendant between midnight and 1:00 a.m. on April 22, 2010.

ERRORS PATENT

A review for errors patent on the face of the record reveals none.

ASSIGNMENTS OF ERROR

Error in Not Excluding Firearms Evidence
Defendant’s first assignment of error asserts that the trial court erred in *1271 denying his motion to exclude the testimony of NOPD Crime Lab Firearms Examiner, Byron Winbush. Defendant suggests Mr. Winbush’s testimony should have been excluded for its failure to satisfy the standard set in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
Defendant filed a motion for a Daubert hearing to exclude firearm evidence on September 20, 2011. Defendant requested and was given permission to question the witness in front of the jury at trial rather than at a separate hearing. On March 23, 20Í2, Defendant’s co-defendant similarly filed a motion to exelude Mr. Winbtish’s testimony, or, in the alternative, to limit the scope of such testimony. On May 30, 2013, a healing was conducted by the trial court on co-defendant’s]¿¡flaubert motion. Defendant’s trial counsel was present but did not participate in the Daubert hearing. Counsel instead reserved his questioning for trial before the jury, though counsel indicated he adopted the arguments, of co-defendant’s counsel. As to co-defendant’s motion, the trial court ruled that the testimony and evidence regarding firearm examination would be allowed. The State called Mr. Winbush to the stand on the last day of Defendant’s trial. After voir dire of his qualifications by Defendant, the trial court allowed him to testify as an expert in the field of ballistics and firearm identification.
The courts of Louisiana have applied the Daubert standard since the Louisiana Supreme Court rendered its 1993 ruling in State v. Foret, 628 So.2d 1116 (La. 1993). This Court recently set forth the standard to be applied as follows:
, To assist the trial courts in their preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and admissible at trial, the Supreme Court expounded on the factors to consider: “1) whether the theory or technique can be and has been tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) the known -or potential rate of error; and 4) whether the methodology is generally accepted by the relevant scientific community.” [State v. Chauvin ] Id., 02-1188, p. 5 [ (La.5/20/03) ], 846 So.2d [697] at 701 (citing Daubert, 509 U.S. at 592-94, 113 S.Ct. at 2796-97). In Foret, the court adopted these factors as a guide for lower courts in resolving the issue. Foret, .628 So.2d at 1123. Thus, in order for technical or scientific expert testimony to be admissible under La. C.E. Art. 702, the scientific evidence must rise to a threshold level of reliability. Id. The trial court may consider one or more of the four Daubert factors, but that list of factors neither necessarily nor exclusively applies to all experts or in every case. Daubert, 509 U.S. at 592-94, 113 S.Ct. at 2796-97. Rather, the law grants a trial court the same broad latitude in determining the reliability of scientific testimony as it does with its ultimate reliability determinations. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999). A trial court has great discretion in determining the competence of an expert witness, and that determination will not be overturned absent an abuse of discretion. La. C.E. art. 702; State v. Gipson, 37,132, p. 16 (La.App. 2 Cir. 6/25/03), 850 So.2d 973, 982.
|, generally, the test for determining an expert’s competency is the expert’s knowledge of the subject about which he is called upon to express an opinion. State v. Ferguson, 09-1422, p. 25 (La. App. 4 Cir. 12/15/10), 54 So.3d 152, 166. “A combination of specialized training, work experience and practical application of the expert’s knowledge can combine, to establish that person as an ex *1272 pert.” Id. (quoting Gipson, 37,132, p. 16, 850 So.2d at 982). Courts can also consider whether a witness has previously-been qualified as an expert. State v. Craig, 95-2499, p. 9 (La. 5/20/97), 699 So.2d 865, 870.
State v. Bernard, 14-0580, pp. 14-15 (La. App. 4 Cir. 6/3/15), 171 So.3d 1063, 1074-75, writ denied, 15-1322 (La. 6/17/16), 192 So.3d 776, cert. denied, — U.S. —, 137 S.Ct. 387, 196 L.Ed.2d 305 (2016).
Defendant relies on Bernard, suggesting this Court permitted the expert testimony in part because Defendant therein “did not produce any documentation calling the methodology into question.” Id. Here, Defendant suggests co-Defendant’s pre-trial Daubert motion, the arguments of which he adopted, and voir dire of Mr. Winbush, sufficiently called his methodology into question. Indeed, while acknowledging the longstanding acceptance of firearms identification testimony in both state and federal courts, co-defendant’s Daubert motion argued that the scientific community has rejected firearms and ballistics analysis as a reliable method of connecting a projectile and/or casing to a specific firearm. In support, co-defendant cited to the Congressionally-funded 2009 report of the National Academy of Sciences, “Strengthening Forensic Science in the United States: A Path Forward” (hereinafter “NAS Report”). Co-defendant’s Daubert motion emphasized the subjective nature in identifying the various class, subclass, and individual characteristics left on a projectile and/or casing after discharge from a firearm, noting that examiners do not rely on an objective standard in concluding whether a match exists or not. Defendant’s motion further noted that matching a projectile/casing to a specific firearm has no known error rate, and that examiners* | ^conclusions can be swayed by contextual information provided by law enforcement. Defendant additionally relied on the Louisiana Supreme Court case State v. Young, 09-1177 (La. 4/5/10), 35 So.3d 1042, in which the Defendant provided notice of his intent to offer expert testimony regarding the vulnerabilities of eyewitness identification. The Court ultimately held the trial court abused its discretion in permitting such testimony, reasoning as follows:
Unquestionably, eyewitness identifications can be imperfect. However, upon review, the touted advances in the social sciences regarding the validity of eyewitness identifications do not render obsolete the underlying premise for which such evidence was held to be inadmissible in Stucke. There is still a compelling concern that a potentially persuasive expert testifying as to the generalities of the inaccuracies and unreliability of eyewitness observations, that are already within a juror’s common knowledge and experience, will greatly influence the jury more than the evidence presented at trial. [State v.] Higgins, 03-1980 at 33-34 [ ((La.4/1/05) ], 898 So.2d [1219] at 1240; [State v.] Stucke, 419 So.2d [939] at 945 [(La.1982)]. By merely being labeled as a specialist in eyewitness identifications, an expert has the broad ability to mislead a jury through the “education” process into believing a certain factor in an eyewitness identification makes that identification less reliable than it truly is. See United States v. Angleton, 269 F.Supp.2d 868, 873-874 (S.D.Tx.2003); United States v. Lester, 254 F.Supp.2d 602, 608-609 (E.D.Va. 2003). Moreover, expert testimony on eyewitness identifications can be more prejudicial than probative because it focuses on the things that produce error without reference to those factors that improve the accuracy of identifications. The expert testimony presumes a mis-ideiitifieation, in the absence of presenting factors which support the validity of *1273 the identification. This fosters a disbelief of eyewitnesses by jurors.
Id. at 1049-50. Defendant suggests the instant case presented a similar risk in allowing a persuasive expert to sway the jury through unreliable testimony. Alternatively, Defendant requested that, at a minimum, the court limit the scope of the testimony to preclude Mr. Winbush from definitively stating that the projectile/casing was a match with the firearm. Again, Defendant argued the lack of a scientific basis in Mr. Winbush’s methodology precluded any such assertion, | iSsuch that his testimony should be limited to describing the characteristics he found to be similar or dissimilar.
At co-defendant’s pre-trial hearing, the State did suggest that a hearing was not even necessary due to the settled nature of the science underpinning their witness' testimony. In so arguing, the State relied in part on Mr. Winbush’s history of testifying in most, if not all, sections of criminal district court. The State attempted to shift the burden to the defense to explain why a hearing would even be necessary. We would note at this point that, as the proponent of Mr. Winbush’s testimony, the State indeed bore the burden of establishing the reliability of his methodology prior to its presentation to the jury. See State v. Franklin, 03-3072, p. 2 (La. 4/23/04), 872 So.2d 1051, 1052. Furthermore, while a witness' history of testifying is a relevant factor to consider per Dau-bert, it does not absolve the State of making a record for appellate review wherein reliability is once again established. Indeed, to the extent that developments in our understanding of the forensic sciences create doubt with respect to any methodology, the State cannot rest solely on its history of acceptance in the courtroom or the witness' history of being accepted as an expert as a proxy for a showing that the testimony is reliable in the case at hand.
The trial court ordered the hearing to proceed. The State’s presentation of Mr. Winbush indicated that he had been with the NOPD for twenty-eight years and was now retired. He began his career as a patrolman, ultimately making his way to the crime lab as a crime scene technician. He began his training as a firearms examiner either in 1990 or 1991, which he described as a two-year apprenticeship with a certified firearms examiner, during which he also attended seminars and classes. He worked as a firearms examiner until 2001, and came back to the crime lulab in 2003 as a supervisor. He left again after two years and returned in 2007 until 2010. He explained that throughout the relevant period, he would attend conventions held by the Association of Firearms and Toolmark Examiners (“AFTME”). He would also periodically review the AFTME journal which included peer-reviewed publications from fellow examiners. He estimated he had completed over 5,000 examinations in his career, half of which he would say involved examining projectiles/casings for purposes of matching them to a specific weapon. He added that he had testified in every section of criminal district court, as well as in federal court, in other parishes, and in another state. He confirmed he was tendered as an expert in all those jurisdictions. In response to whether controls on his methodology existed, Mr. Winbush stated examiners received proficiency tests from “different companies” that would generate reports indicating whether the examiner passed or failed. He estimated he would complete such tests once every six months, and never received a report of failure.
On cross-examination, Mr. Winbush explained his apprenticeship in more detail, noting that he learned how to identify different bullets, how the different firing mechanisms worked in different firearms, how different firearms have different numbers of “twists,” and how to compare “stri *1274 ations” using a comparison microscope. He would receive tests under the examiner who trained him, which. essentially involved comparing projectiles and casings. Mr. Winbush stated he had read some studies regarding, the nature of the methodology he employed, but during the 1990s and. early 2000s, not later in his tenure when he became a supervisor. Mr, Win-bush explained the process for an examination, which involved comparing a.test-fired casing/projectile to one recovered from a crime scene or autopsy under a comparison microscope; the examiner then notes the number of | ] ¡¡“lands” and “grooves” on each of the specimens. He acknowledged the microscope had the ability to take photographs- of what he observed but that he elected not to take any photographs. The next step, he explained, -is to determine whether there is a match, which is noted in a report. He stated he did not keep any separate reports which explained his conclusions as to why a match did or did not exist. Further, Mr. Winbush was not aware of any error rate with respect to the type of testing he performed. With respect to the specific testing done in this case, Mr. Winbush acknowledged he received information that the evidence was retrieved as a result of a homicide investigation and the names of the accused. In all examinations, he starts by noting whether the number of twists and their directions match. He also weighs the specimens and then puts them under a two-stage microscope to observe the striations, or microscopic lines deposited on the bullet when the gun is fired. He explained that he begins with “class characteristics,” which he described as looking at the “rifling characteristics,” again referring to the number of twists and their direction. If they match, “I’m on the right track” he stated. Mr. Winbush also responded that he looks for subclass characteristics, which he described as the microscopic lines, or “striations” left on the bullet and previously described. Class-characteristics, he acknowledged, are shared by several types of guns, but he described subclass characteristics as a “fingerprint” for a particular firearm. When asked about “individual” characteristics, he equated those with “rifling,” or class characteristics. During his time at the lab, Mr. Winbush- stated that standard operating procedure was to compare class and subclass characteristics, relying on subclass characteristics to identify a projectile/casing to a specific weapon. Mr. Winbush stated that “it’s up to the individual firearms examiner” whether a match exists or not. After repeated questioning regarding the existence of any criteria at hflNOPD for identification, Mr. Winbush stated “we generally do not identify a bullet unless we have four lands and grooves and the sub-characteristics are identifiable.” The cross-examination also covered Mr. Winbush’s review of the shell casings, which included review of striations and the firing pin impression left on the face of the cartridge case.
Many of the same points were raised at trial during Defendant’s voir dire of Mr. Winbush. The trial court once again permitted Mr. Winbush to testify as an expert, and Mr. Winbush’s report was admitted into evidence, though not specifically discussed. Mr. Winbush explained that the specific weapon tested was a “Baikal 9 millimeter Makarov” and that such weapons use a “cartridge case or bullet that is generally specific to this weapon,” He added, “[the weapon] can fire a 9 millimeter bullet, but after it fires the first bullet, and it’s not a Makarov, it usually hangs up[,]” apparently because the base of the Maka-rov “is a millimeter smaller and it’s specifically made for a Makarov.” Mr, Winbush then proceeded to generally describe the comparison process, and was asked what conclusions he drew from the comparison. In response, Mr. Winbush stated, “[t]he cartridge case that was recovered from the scene and the bullet that was recovered *1275 were fired from this [9-millimeter] weapon [recovered from L.L.’s bedroom].” In elaborating, he noted that both specimens, the test-fired and evidence specimens, had “four lands and grooves.” Both also had “four striation marks” that matched one another.
The specific issue raised by Defendant here has been addressed numerous times, most often at the federal level. Such jurisprudence is relevant to our analysis here, as the Louisiana Supreme Court made clear in Foret:
Since much of the Louisiana Code of Evidence is patterned after the Federal Rules of Evidence in an attempt to facilitate a “movement towards a uniform national law of evidence”, it seeing 17 appropriate for Louisiana courts to, “especially where the language of the Louisiana Code is identical or virtually identical with that used ... in the federal rules” utilize this “body of persuasive authority which may be instructive in interpreting the Louisiana Code.” La.C.E. art. 102, Comment “a”. As the Louisiana Code of Evidence provision on expert testimony is identical to the federal Rule, it follows that this court should carefully consider the Daubert decision that soundly interprets an identical provision in the federal law "of evidence.
Foret, 628 So.2d at 1122-23. Louisiana Code of Evidence art. 702 and Rule-702 of the Federal Rulés of Evidence provide:
A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(1) The expert’s scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(2) The testimony is based on sufficient facts or data;
(3) The testimony is the product of reliable principles and methods; and
(4) The expert has reliably applied the principles and methods to the facts of the case.
Here, it cannot be disputed that the testimony offered by the State is relevant. Indeed, that a weapon recovered from Defendant’s home would match a projectile and casing from the scene of the incident is probative of the issue of Defendant’s guilt. Here, the question before the court is reliability. Thus, we focus our analysis on that issue.
We begin with Louisiana jurisprudence. The Second Circuit Court of Appeal, in State v. Williams, 42,914 (La.App. 2 Cir. 1/9/08), 974 So.2d 157, 162-63, provided the following reasoning for allowing similar testimony:
The use of expert testimony to identify spent cartridge cases or bullets to a particular firearm has a long history in Louisiana and elsewhere and has been the subject of Daubert challenges in other | ^jurisdictions. See, e.g., U.S. v. Diaz, 2007 WL 485967 (N.D.Cal.2007) (“No reported decision has ever excluded firearms-identification expert testimony under Daubert.”); U.S. v. Monteiro, 407 F.Supp.2d 351 (D.Mass.2006) (collecting cases). The Monteiro case discusses the available literature and evidence regarding the error rate in firearms examination and identification and observes that the extant information about examiner error is limited in its usefulness by the methodology of the studies so far conducted on that topic.
In the instant case, the reliability of Mr. Beighle/s testimony is established by the expert’s documentation of the process he used to reach his conclusion. In particular, the comparison microscope photograph of the two projectiles provides a particularized record of the ex *1276 pert’s methodology. The photo shows dozens of striations on both projectiles, and those striations are identical across the groove in the projectiles cut by the rifling in the barrel. Nothing in our review of the testimony of the expert witness and our visual comparison of the photographs of the two projectiles suggests in any respect that the trial court should have pursued further inquiry into the potential for error. Nothing in the record suggests that the trial court abused its discretion in allowing this testimony. We find, therefore, that this assignment of error is without merit.
The Third Circuit Court of Appeal, in State v. Williams, 13-497, p. 14 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, 1245-46, also allowed such testimony:
Here, the record indicates that Mr. Stelly testified about his education and experience. Notably, at the time of trial, Mr. Stelly had been working for the North Louisiana Criminalistics Laboratory since 1993, and he had been qualified as an expert approximately 100 times in the field of firearms identification. He also testified that, in addition to a bachelor’s degree in toxicology, he did twenty months of training when he was hired by the crime lab. The defense attorney questioned Mr. Stelly about the National Academy of Sciences report. Mr. Stelly testified that he has testified about a dozen times since the publication of the report and has been questioned about it on a majority of those occasions. Mr. Stelly also demonstrated that he was familiar with the published error rates for firearms and toolmark identification. We additionally note that, on direct and cross-examination, Mr. Stelly testified .as. to the science of firearms identification and its methodology, and how he applied it to the tested items in this case. Further, the defendant subjected Mr. Stelly to stringent cross-examination concerning the reliability of that testimony, including Mr. Stelly’s documentation protocol and whether he had accounted for weapons that may have similar manufacturing marks to the weapon tested herein.
11flThus, according to the jurisprudence of this State, testimony regarding the witness’s background, qualifications, training, and experience such as that presented in the instant matter supports the trial court’s ruling that Mr. Winbush’s testimony was reliable per Daubert.
The federal jurisprudence on this issue is much more comprehensive. Perhaps the most instructive case is U.S. v. Otero, 849 F.Supp.2d 425 (D.N.J. 2012). Otero is similar to this case in that Defendants sought to exclude the testimony of the government’s firearms witnesses, which testimony included assertions that a projectile and a shell were discharged from a specific weapon. Notably, Otero was decided after release of the NAS Report, and thus may guide this court in addressing Defendant’s contention that our ruling in the Bernard, case rested on appellant’s failure to “produce any documentation calling the methodology into question.” Bernard, 171 So.3d at 1075.
The Otero decision provided the obligatory review of the Daubert standard, noting that “the reliability of expert testimony does not turn on the grounding of the expert’s opinion in scientific principles.” Otero, 849 F.Supp.2d at 431. In discussing—and ultimately validating— the “testability” of the theory used by the government witnesses in reaching their conclusion, the Otero opinion described the AFTME[2] as “the leading in- *1277 temational organization for firearms and toolmark examiners.” Id. at 431. Under the AFTME theory of examination, an examiner can “conclude that two bullets or two cartridges are of common origin, that is, were fired from the same gun, when the microscopic surface contours of their toolmarks |2f)are in ‘sufficient agreement.’”[3] Id. Additionally, the court noted that there exists “a subjective component” in such a standard as it “must necessarily be based on the examiner’s training and experience.” Id. at 432. In further support of its finding that the methodology was testable, the court noted the “industry standard” requiring that “one examiner’s findings must be reviewed by another examiner to confirm, or possibly disagree, with those findings,” a process known as “peer review.” Id. at 433.
The Otero opinion found the methodology had been subject to peer review and publication, with reference to the AFTME Journal. Id. It also reviewed the literature on error rates, concluding, “while a definitive error rate has not been calculated, the information derived from the proficiency testing is indicative of a low error rate.” Id. at 433-34.
Otero further found that the law enforcement agency in question maintained a manual of procedures which followed the AFTME standard, which required the examiner to, among other things, “establish reproducibility of class and individual characteristics,” consider “the entire evidence surface,” and submit his or her | ^examination- to peer review. Id. at 434-35. Reviewing the testimony of the government’s AFTME-certified witness, the court observed:
Deady testified that he followed all NJSP laboratory procedures in conducting the subject examinations. He documented his observations and findings with detailed notes and explanations in his report, which not only gave his conclusions as to a positive match but also stated the reasons for that conclusion. For example, the report states that Deady’s comparison of the test 9 mm shells he fired with the evidence 9 mm shell results in a positive identification of the origin weapon because he found pattern matching according to the CMS method as to breechface marks, firing pin drag and firing pin aperture shearing and a match as to the firing pin impression (where CMS is not applicable). Deady also took a number of photographs, known as photomicrographs, of the side-by-side microscopic images of the evidence and test specimens as compared for agreement regarding various types of toolmarks, such as striations *1278 made by impact of the cartridge against the breech face of the 9 mm’s firing chamber and impressions left by the firing pin. Additionally, Deady’s report, and his testimony, reflect that the peer review procedure was followed in his examination.
Id. at 435.
Lastly, the court found the theory previously described had been “widely accepted in the forensic community.” Id. The opinion noted that some courts which have “criticized the bases and standards” of the discipline have permitted identification testimony, “albeit with limitations.” Id.
Ultimately, the court permitted the testimony. Id. at 438. Furthermore, despite its recognition of the NAS Report’s conclusion that “claims for absolute certainty ... may well be somewhat overblown[,]” the court nonetheless allowed the witnesses to link the projectile/casing to a specific weapon. Id.
Other federal cases have not been as generous as Otero. For example, the court in U.S. v. Ashburn, 88 F.Supp.3d 239, 250 (E.D.N.Y. 2015) permitted identification testimony of the government’s witness, but precluded the witness Lgfrom declaring absolute certainty about a match. Instead, the court suggested language such as “the conclusion was reached to a ‘reasonable degree of ballistics certainty' or a ‘reasonable degree of certainty in the ballistics field.'” Id. A similar result was reached prior to publication of the NAS report in U.S. v. Monteiro, 407 F.Supp.2d 351, 355 (D. Mass. 2006).
Based on the foregoing, it cannot be said that the jurisprudence supports Defendant’s assertion that the scientific community has rejected the methodology and theory of firearms identification. To the contrary, even after publication of the NAS Report, courts have addressed, in detail, the reliability of such testimony and ruled it admissible, although to varying degrees of specificity.
Based on the foregoing, we conclude the trial court did not err in admitting the witness’s testimony in its particular form. Accordingly, review of whether the alleged error was harmless is unnecessary.

Error in Denying Mistrial/Prosecutorial Misconduct

Defendant contends the trial court abused its discretion when it denied his motion for a mistrial based on the prosecutor’s comment during rebuttal closing argument. Defendant asserts the prosecutor alleged he committed perjury in an unrelated case. At the end of rebuttal, Defendant moved for a mistrial, arguing the State had repeatedly commented on facts not in evidence, that is, the supposed perjury. Defendant claims the mistrial motion was erroneously denied.
Louisiana Code of Criminal Procedure art. 774 addresses the scope of closing argument as follows:
12aThe argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
The argument shall not appeal to prejudice.
The state’s rebuttal shall be confined to answering the argument of the defendant.
The Louisiana Supreme Court, in State v. Reed, 14-1980, p. 32 (La. 9/7/16), 200 So.3d 291, 315 (emphasis in original), recently summarized the law relevant to alleged improper remarks during argument as follows:
Louisiana jurisprudence on prosecutorial misconduct allows prosecutors considerable latitude in choosing closing argument tactics. The trial judge has wide discretion in controlling the scope of *1279 closing argument. State v. Prestridge, 399 So.2d 564, 580 (La. 1981). Even if the prosecutor exceeds these bounds, a reviewing court will not reverse a conviction due to an improper remark during closing argument unless the court is thoroughly convinced the argument influenced the jury and contributed to the verdict, “as much credit should be accorded the good sense and fair mindedness of jurors who have seen the evidence and heal’d the arguments, and have been instructed repeatedly by the trial judge that arguments of counsel are not evidence.” State v. Martin, 93-0285, p. 18 (La. 10/17/94), 645 So.2d 190, 200; see State v. Jarman, 445 So.2d 1184, 1188 (La. 1984); State v. Dupre, 408 So.2d 1229, 1234 (La. 1982).
The Court continued:
Even assuming the prosecutor exceeded the bounds of proper rebuttal argument, the trial court clearly acted within its discretion when it denied the mistrial motion. See La.C.Cr.P. art. 775; State v. Sanders, 93-0001, p. 21 (La. 11/30/94), 648 So.2d 1272, 1288; State v. Smith, 430 So.2d 31, 44 (La. 1983) (Mistrial is a drastic remedy generally, and the determination “of whether prejudice has resulted lies in the sound discretion of the trial judge.”).
Id. at 318.
In State v. Franklin, 15-1060 (La.App. 4 Cir. 8/24/16), 198 So.3d 1222, the defendant asserted he was deprived of a fair trial due to prosecutorial misconduct during the State’s closing argument. The defendant argued that the prosecutor | ^made outrageous and prejudicial comments alleging his defense counsel conspired to present perjured testimony. This Court stated:
Regarding prosecutorial misconduct during closing argument, the Louisiana Supreme Court has set forth the following:
Louisiana jurisprudence on prosecu-torial misconduct allows prosecutors wide latitude in choosing closing argument tactics. See State v. Martin, 539 So.2d 1235, 1240 (La.1989) (holding closing arguments that referred to “smoke screen” tactics and defense as “commie pinkos” inarticulate but not improper); State v. Copeland, 530 So.2d 526, 545 (La.1988) (holding prosecutor’s waving gruesome photo at jury and urging members to look at it if they became “weak kneed” during deliberations as not improper). Further, the trial judge has broad discretion in controlling the scope of closing arguments. State v. Prestridge, 399 So.2d 564, 580 (La.1981). And, even if the prosecutor exceeds these bounds, the court will not reverse a conviction unless “thoroughly convinced” that the argument influenced the jury and contributed to the verdict. See State v. Martin, 93-0285, p. 17 (La.10/17/94), 645 So.2d 190, 200; State v. Jarman, 445 So.2d 1184, 1188 (La.1984); State v. Dupre, 408 So.2d 1229, 1234 (La. 1982).
Even if we were to assume that the prosecutor’s comments in this case were outside the proper scope of closing arguments, the defendant is still not entitled to relief. The court must be thoroughly convinced that the argument influenced the jury and contributed to the verdict before reversing a conviction based on misconduct during the closing arguments.
State v. Casey, 1999-0023, p. 17 (La.1/26/00), 775 So.2d 1022, 1036.
Moreover, this Court has recognized that “[e]ven when the prosecutor’s statements are improper, a reviewing court should accord credit to the good sense and fairmindedness of the jury that heard the evidence.” State v. Webb, 13-0146, p. 27 (La.App. 4 Cir. 1/30/14), 133
*1280 So.3d 258, 276 (citing State v. Harvey, 08-0217, p. 4 (La.App. 4 Cir. 5/13/09), 12 So.3d 496, 499).
Id. at 1231.
Defendant asserts that during the State’s rebuttal closing argument, the prosecutor launched into an “unprovoked tirade,” making improper comments hswhich suggested to the jury that Defendant committed the crime of perjury when testifying in Jamaal Tucker’s case. When defense counsel objected on the ground that there was no evidence to support such an accusation, the trial court interrupted him and merely advised the prosecutor to move on to something else.
That Defendant was a witness in an unrelated murder trial arose as a result of Defendant calling a staff investigator from the Orleans Public Defender’s Office to testify that she had been with Joshua Lee preparing for the Tucker trial most of the day before and after the incident took place in the current case. Defendant asserts he was simply attempting to establish his whereabouts and his demeanor in the time frame surrounding the incident.
The State cross-examined the investigator about Defendant’s testimony in the Tucker trial. The State questioned the investigator about the fact that Tucker eventually pled guilty to manslaughter after his murder conviction was overturned, implying that Defendant must have been lying since Tucker admitted he was guilty of manslaughter.
During defense closing argument, defense counsel referenced the prosecutor’s “fury” over Defendant’s testimony on behalf of Tucker, and suggested that the State might have focused on Joshua Lee as the murderer in the present case due to the State’s enmity against him for testifying in the Tucker case. Thereafter, during the State’s rebuttal, the prosecutor stated:
When the defense attorney comes in here and says I have a problem with defense witnesses, that is false. Did I have a problem with Mr. Guy? Not at all. You know what I have a problem with? Defense witnesses who lie and take the stand and try to deceive you all. Ladies and Gentlemen of the jury, to let a murderer walk out the front door of the court steps, right out of the courthouse. That’s what he wants. When somebody takes the stand and lies, and he took the stand for his friend for a murder trial and the friend subsequently comes in and says, I did it, what does that tell you about his testimony? I have a laJiuge problem with that because it sends our justice system back and back and back. And you know what else? It makes people not want to come forward. It scares everybody else and we have to fight this battle every day. I have a huge, huge, huge problem with the defense witnesses coming in and lying.
A review of the closing and rebuttal statements indicates the State primarily focused on the testimony and evidence adduced at trial. In addition, the portion of the argument complained of was in response to comments made during Defendant’s closing argument winbushand trial testimony given by a defense witness. The State did not directly assert Defendant committed perjury, and upon objection by defense counsel and quick admonition by the trial court, the State discontinued this line of argument.
The record clearly demonstrates that the trial judge instructed the jurors, at the commencement of trial and prior to handing the case over for their deliberation, that the attorneys' arguments do not constitute evidence.
Defendant asserts the trial court erred in failing to grant his motion for mistrial as required by La. C.Cr.P. art. 770(2). In State v. Edwards, 97-1797 (La. 7/2/99), 750 *1281 So.2d 893, 907, the Louisiana Supreme Court stated:
Comments must be viewed in light of the context in which they are made. State v. Webb, 419 So.2d 436, 440 (La. 1982). Moreover, a comment must not “arguably” point to a prior crime; to trigger mandatory mistrial pursuant to Article 770(2), the remark must “unmistakably” point to evidence of another crime. State v. Babin, 336 So.2d 780 (La.1976) (where reference to a “mug shot” was not unmistakable reference to a crime committed by defendant); State v. Harris, 258 La. 720, 247 So.2d 847 (1971) (where no crime was evidenced by a police officer’s reference to obtaining defendant’s photograph from the Bureau of Investigation). In addition, the imputation must “unambiguously” point to defendant. State v. Edwards, 406 So.2d 1331, 1349 (La.1981), cert. denied sub nom. Edwards v. La., 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1982). The defendant has the burden of proving that a mistrial is warranted. See State v. May, 362 So.2d 516 (La.1978).
_y¡jWe are not “thoroughly convinced” that the verdict the jury reached was attributable to the prosecutor’s errant comments regarding Defendant’s testimony in the Tucker trial. The trial court did not abuse its discretion when it denied Defendant’s motion for mistrial.

CONCLUSION

For the foregoing reasons, Defendant’s conviction is affirmed.
AFFIRMED
J. Lobrano concurs in the result of the majority opinion.

. Pursuant to the requirements of confidentiality as set forth in La. Ch.C. art. 412, the juvenile, who was sixteen years of age at the relevant time, is referred to by his initials, L.L.

. Otero uses the acronym ‘'AFTE” for the Association of Firearm and Toolmark Examiners, whereas this opinion uses "AFTME.”

. Otero provides the following definition of "sufficient agreement,” drawn from secondary sources:
This sufficient agreement is related to the significant duplication of random toolmarks as evidenced by a pattern or combination of patterns of surface contours. Significance is determined by the comparative examination of two or more sets of surface contour patterns comprised of individual peaks, ridges and furrows. Specifically, the relative height or depth, width, curvature, and spatial relationship of the individual peaks, ridges and furrows within one set of surface contours are defined and compared to the corresponding features in the second set of surface contours. Agreement is significant when it exceeds the best agreement demonstrated between toolmarks known to have been produced by different tools and is consistent with agreement demonstrated by toolmarks known to have been produced by the same tool. The statement that "sufficient agreement” exists between two tool-marks means that the agreement is of a quantity and quality that the likelihood another tool could have made the mark is so remote as to be considered a practical impossibility.
Otero, 849 F.Supp.2d at 431 (emphasis in original).